**Orazio DiROCCO, John A. DiRocco, Richard DiRocco, and Nicholas DiRocco, d/b/a DiRocco Brothers**

v.

**MICHIGAN MUTUAL INSURANCE COMPANY.**

**Civ. A. No. 87–1886.**

United States District Court, E.D. Pennsylvania.

Aug. 16, 1988.

---

William H. Mitman, Jr., West Chester, Pa., for plaintiffs.

Michigan Mut. Ins. Co. by Charles A. Harad, Harad & Snitow, Philadelphia, Pa., for defendant.

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

The question presented in this diversity case is whether DiRocco Brothers ("DiRocco")—a family firm of four brothers engaged in hauling stone and other heavy construction materials—is entitled to recover from Michigan Mutual Insurance Company ("Michigan Mutual"), on a business auto policy covering DiRocco's vehicles, for the theft of a heavy truck on which DiRocco had just taken delivery but on which DiRocco had only made a small down payment and for which DiRocco had not yet received the certificate of title.

The controlling facts are stipulated:

A. The plaintiffs are Orazio DiRocco, John A. DiRocco, Jr., Richard DiRocco, and Nicholas DiRocco doing business as DiRocco Brothers.

B. The DiRocco Brothers is a partnership organized pursuant to the laws of the Commonwealth of Pennsylvania with its principal place of business located at 501 Montgomery Avenue, West Chester, Pa.

C. The main business activity of the partnership consists of hauling stone, asphalt, gravel or other materials to and from construction projects, such as roads, parking lots, et cetera.

D. The partnership has been in business since September 1983.

E. The defendant is the Michigan Mutual Insurance Company with home offices in Detroit, Michigan. The defendant does business in Pennsylvania from an office located at 510 Park Road North, Wyomissing, Berks County, Pennsylvania.

F. The plaintiffs were covered under a business auto policy, a copy of which has been attached to plaintiffs' complaint, which is marked Exhibit A-1. All premiums have been paid on the policy, and the policy was in full force and effect during September 1986.

G. The policy covered all of the vehicles owned by the plaintiffs; i.e. the plaintiffs owned and operated a small fleet of vehicles, each of which was insured pursuant to the Michigan Mutual policy.

H. The Michigan Mutual policy provided for a deductible of $250, by which amount any moneys owed to plaintiffs under the theft coverage would be reduced.

I. Plaintiffs were not named insureds under any other policies which insured their vehicles from loss due to theft.

J. On or about July 17th, 1986, the plaintiffs entered into an agreement to purchase two Mack heavy trucks from Keystone Sales, Inc. (Keystone).

K. On the same day, the plaintiffs, acting through Richard DiRocco, executed a purchase order for the trucks. A copy of the aforesaid purchase order is attached hereto and marked Exhibit C(1).

L. The terms of the aforesaid agreement were: I. The purchase price of each truck, including federal excise tax, was $74,562; II. Each truck would be equipped in accordance with the specifications set forth on the purchase order; III. A down payment of $1,000 per truck was to be paid at the time the purchase order was executed; IV. Delivery of the truck was to be accomplished as soon as possible with payment of the balance of the purchase price due upon delivery.

M. The plaintiff and Keystone understood that these vehicles were to be new vehicles, and that certain items of equipment would be added to the vehicles after they were obtained by Keystone. The vehicles were to be delivered to the plaintiff after these equipment additions were accomplished by Keystone, or people acting on Keystone's behalf.

N. Pursuant to the terms of the aforesaid agreement, the plaintiffs did pay a down payment of $1,000 per truck to Keystone on or about July 17th, 1986.

O. At all times relevant to the instant litigation, Keystone Mack sales was covered by a policy issued by the Industrial Indemnity Company, which provided theft coverage for the two Mack trucks identified in plaintiffs' purchase order while they remained part of Keystone's inventory. A copy of the aforesaid policy has been attached hereto and made a part hereof as Exhibit C(2).

P. After placing the purchase order on July 17th, 1986, the plaintiffs contacted a painting business known as Broyles Refinishing, Inc. (Broyles). This business is conducted at 207 Garfield Avenue, West Chester, Chester County, Pa.

Q. The plaintiffs and Broyles entered into an oral agreement whereby Broyles was to paint the two trucks the company colors. Broyles had painted various vehicles owned by the plaintiffs prior to this occasion.

R. The plaintiffs advised Keystone to bring the trucks to Broyles directly once the agreed upon modifications to the trucks had been performed so that Broyles could commence the paint work in a timely manner.

S. On or about September 10, 1986, the vehicles were driven by Keystone employees to the Broyles' premises. The keys to the vehicles were left by the Keystone drivers with Broyles. The license tags used on the trucks to transport were dealer tags from Keystone. No documents of title accompanied the trucks from Keystone to Broyles, and the balance of the purchase price was not paid.

T. At the time the trucks were brought to Broyles, all of the agreed upon modifications had not yet been performed upon the truck which was ultimately stolen from the Broyles' yard. An exhaust mounting bracket which was on back order had yet to be installed. It was still not installed at the time of the alleged theft. Although plaintiff and Keystone agreed that plaintiffs would install this bracket themselves once the part became available, the part was unavailable and still on back order at the time of the alleged theft.

U. Thereafter, Broyles' employees commenced painting one of the trucks. Work on that truck proceeded uneventfully, was completed, and at a later date the truck was driven from Broyles' premises to the plaintiffs' premises by one of the plaintiffs.

V. The other truck, VIN number QMWPL38C4CC014819, remained where it had been parked on the Broyles' premises by the Keystone driver because it could not be started.

W. Sometime prior to the alleged theft of this Mack truck, plaintiff, Richard DiRocco, went to Broyles Refinishers for the purposes of restarting the vehicle, and left the premises once this purpose was accomplished.

X. The time plaintiff Richard DiRocco started the truck on the Broyles' premises was the only time any of the plaintiffs saw said vehicle between the time it was brought to Broyles' and the time it was allegedly stolen.

Y. On the afternoon of September 16th, 1986, Mr. Broyles removed the truck from the place where it had been parked to a different parking area also upon his premises. He locked the truck and put the keys in his office.

Z. Sometime during the evening hours of September 16th, or the early morning hours of September 17th, the aforesaid vehicle was stolen from the Broyles' premises by a person or persons unknown. It has never been recovered.

AA. On the morning of September 17th, the plaintiff, Richard DiRocco, went to the Broyles' premises and discovered that the truck was missing. The police were contacted that morning and conducted an investigation into the theft.

BB. Later that morning, plaintiff, Orazio DiRocco, notified the agent (Peterman) of the alleged theft, provided him with the VIN for the truck, and confirmed that plaintiffs had a valid policy in force with the defendant.

CC. On September 18th, 1986, a representative of Keystone Mack visited the plaintiffs at their place of business. At that time, the plaintiffs were presented with two invoices covering both trucks. A copy of the invoice covering the stolen vehicle has been attached hereto and made a part hereof of Exhibit C(3).

DD. At the time, September 18th, 1986, plaintiffs paid Keystone the balance of the purchase price on both vehicles.

EE. As of the date and time of the theft, the balance of the purchase price had not been paid, nor had any documents of title been executed in favor of or delivered to the plaintiffs.

The principal issue of law generated by these stipulated facts is whether, at the time of the theft, the truck had passed from Keystone's ownership to DiRocco's and hence was covered by DiRocco's Michigan Mutual policy.

DiRocco relies on Section 2–401(2) of the Uniform Commercial Code (13 Pa.C.S.A. § 2401(2)):

Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods....

■ In reply, Michigan Mutual insists that Keystone and DiRocco had, within the meaning of § 2–401(2), "explicitly agreed" that title would not pass until the balance due on the truck was paid to Keystone; according to Michigan Mutual, the Keystone–DiRocco understanding contemplated "cash on delivery." [1]

■ While the stipulated facts do show that "Delivery of the truck was to be accomplished as soon as possible with payment of the balance of the purchase price due upon delivery," the record does not support a finding that Keystone and DiRocco "explicitly agreed" that title would remain in Keystone pending payment of the balance.[2] To the contrary, the stipulated facts establish an agreement to deliver the truck to a place—the Broyles yard—at which the truck, by being painted "the [DiRocco] company colors," would be visibly transformed forthwith into a unit of the DiRocco fleet. Indeed, the Keystone–Di-

**1.** DiRocco argues that Michigan Mutual is estopped to challenge DiRocco's claim because in November of 1986, some two months after the theft, Michigan Mutual issued a policy endorsement retroactively acknowledging the truck to be covered by the policy effective as of September 12, i.e. prior to the theft. The estoppel argument is without merit The record shows that the endorsement was a procedural mechanism adopted by Michigan Mutual to process the DiRocco claim. Moreover, there is no indi-cation that the endorsement resulted in any detrimental reliance on DiRocco's part.

**2.** The observation by Joseph Duggan, Keystone's sales representative, that "I would suppose title is normally transferred in these transactions when the money is paid for the truck," is, at most, a legal speculation by one who does not appear to be a lawyer. It cannot do service as evidence of what was "explicitly agreed".

Rocco understanding that the truck was to be delivered for painting yields the emphatic inference that receipt of the truck by Broyles, on DiRocco's behalf, constituted, in UCC terms, "acceptance" of the truck, since the intended painting of the truck in DiRocco's "company colors" would clearly be "inconsistent with the ownership of the seller." 13 Pa.C.S.A. § 2606(a)(3).[3]

The conclusion that title passed to DiRocco on delivery of the truck to the Broyles yard is in harmony with *Semple v. State Farm Mutual Auto Insurance Co.*, 215 F.Supp. 645 (E.D.Pa.1963). On the facts there presented, Judge Grim concluded that the seller's automobile liability policy was not in force with respect to an accident that took place after the seller had given the purchaser the car, the keys and the certificate of title but before the seller had executed an affidavit assigning the certificate of title (a statutorily prescribed formality).[4] According to Judge Grim's analysis of UCC § 2–401(2), "the car ("the goods") was left at Semple's place of employment at a time when Semple was at that place, and at that time Witmer turned the keys over to him. This constituted physical delivery of the goods, and under § 2–401(2) title then passed to Semple. Even though the delivery of the keys might be considered a symbolic delivery, as in livery of seisin, they placed in Semple the power to operate the car." 215 F.Supp. at 647.[5]

Michigan Mutual argues in the alternative that if this court "determines that both the seller, Keystone ... and the [DiRocco] buyers shared an ownership interest in the 1986 Mack truck prior to its theft," it would then follow that Michigan Mutual's liability should be confined "to the pro rata share which the limits of its policy bears [sic] to the limits of the theft policy covering the inventory of Keystone." Michigan Mutual builds this argument on the policy language which provides that, "When two or more policies cover on the same basis, either excess or primary, we will pay only our share."

DiRocco counters with the submission that pro rata provisions have application "when two policies cover the same interests, in the same property, against the same risks, and for the benefit of the same person." Only when the policies have these elements in common—so DiRocco urges—can they be said to "cover on the same basis."

Michigan Mutual argues that the Pennsylvania Supreme Court's decision in *Insurance Company of North America v. Alberstadt*, 383 Pa. 556, 119 A.2d 83 (1956), is decisive authority to the contrary. The court there found that two fire insurance policies, written by two different carriers, in favor of two different assureds—one the seller at a sheriff's tax sale, the other the purchaser—were both in force at the time of the fire. The court then determined that (1) only one of the assureds—the purchaser—could recover, since the seller retained no effective interest in the realty except an ultimately unexercised right of redemption; (2) the aggregate recovery could not be more than the actual loss (a figure greater than the buyer's policy ceiling but smaller than the seller's); and (3) the recovery

---

3. In *Palladino v. Dunn*, 361 Pa.Super. 99, 521 A.2d 946 (1987), relied on by Michigan Mutual, the court found on the facts there presented that there had been no "acceptance" of the new car by the putative buyer.

4. Drawing on *Majors v. Majors*, 349 Pa. 334, 37 A.2d 528 (1944), and *Braham & Co. v. Steinard–Hannon Motor Co.*, 97 Pa.Super. 19 (1929), Judge Grim concluded that "in Pennsylvania a certificate of title does not constitute more than some evidence of ownership," and therefore "Witmer's failure to take the affidavit to the assignment of the certificate did not operate to prevent actual transfer of ownership of the car." 215 F.Supp. at 647. Similarly in the case at bar, the fact that the certificate of title was not delivered by Keystone contemporaneously with the car and the keys "did not operate to prevent actual transfer of ownership of the [truck]."

5. *Michigan Mutual* seeks to distinguish *Semple* on the ground that the buyer had paid the full purchase price at the time of delivery; however, that fact was not mentioned by Judge Grim as a dispositive ingredient. Whether, after delivery and prior to receiving the balance due, Keystone could have sought rescission or replevin, is a question not presented by this case. *Cf. Tracey Motor Co. v. Union National Bank*, 26 Beaver C.L.J. (1964).

should be apportioned against the two carriers in proportion to the policy ceilings.

Two factors—one procedural, one substantive—militate against the application of *Alberstadt* to this case. The procedural impediment is that in *Alberstadt* both carriers and both assureds were before the court, whereas here only one carrier and one assured are subject to this court's authority. The substantive impediment is that the two cases are not, doctrinally, on all fours. In *Alberstadt*—which Chief Justice Stern characterized as presenting "a somewhat unusual factual situation"—seller and buyer had concurrent insurable interests because one had an equitable interest and the other a legal interest until, a year after acknowledgment of the sheriff's deed, the seller's unexercised equity of redemption expired. By contrast, on the record presented by the case at bar, there is no ground for drawing the inference that Keystone—which, like its carrier, is *not* a party to this proceeding—had an insurable interest in the truck after delivering it to the Broyles yard.

### Conclusion

For the foregoing reasons, which constitute this court's findings of fact and conclusions of law, an order will be entered for judgment in favor of DiRocco Brothers and against Michigan Mutual in the amount of $74,562.00 plus interest and costs. The parties are to submit a joint draft order— or, if they are unable to agree on the quantum of interest, two draft orders— within ten days from the date of this Memorandum. Defendant's participation in the preparation and submission of a draft order will not, of course, be deemed a waiver of defendant's entitlement to challenge the substance of the order, by appeal or otherwise.